UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

BRIANA KIRKLAND,

       *Plaintiff*,

v.

DONALD J. TRUMP,

       *Defendant.*

Case No. 1:22-cv-00034-AMP

MEMORANDUM OF LAW IN SUPPORT OF
DEFENDANT'S MOTION TO DISMISS

# TABLE OF CONTENTS

TABLE OF CONTENTS ............................................................................................................... i

TABLE OF AUTHORITIES ........................................................................................................ ii

BACKGROUND ........................................................................................................................... 2

THE ALLEGATIONS AGAINST PRESIDENT TRUMP ............................................................ 6

ARGUMENT ................................................................................................................................. 7

      I.    Absolute immunity bars the claims against President Trump. .......... 7

          a.    The nature of President Trump's speech and practical need to insulate the President from improper influence upon his decision-making support a finding of presidential immunity. .................... 9

          b.    The speech on which Plaintiff's allegations rely was made in President Trump's official capacity. ............................................ 10

CONCLUSION ............................................................................................................................ 11

CERTIFICATE OF SERVICE .................................................................................................... 12

# TABLE OF AUTHORITIES

## Cases

*Am. Fed'n of Gov't Emps. v. Off. of Special Couns.*,

   1 F.4th 180, 187–88 (4th Cir. 2021) .................................................................................. 10

*Ashcroft v. Free Speech Coal.*,

   535 U.S. 234, 253 (2002) ..................................................................................................... 3

*Behrens v. Pelletier*,

   516 U.S. 299, 308 (1996) ..................................................................................................... 8

*Blassingame et al. v. Trump*,

   Case No. 1:21-cv-00858 (D.D.C. June 24, 2021) ................................................................ 2

*Brandenburg v. Ohio*,

   395 U.S. 444, 449 (1969) ................................................................................................ 3, 4

*Chastain v. Sundquist*,

   833 F.2d 311, 315 (D.C. Cir. 1987) ..................................................................................... 7

*Clinton v. Jones*,

   520 U.S. 681, 696 (1997) ..................................................................................................... 7

*Harlow v. Fitzgerald*,

   457 U.S. 800, 807 (1982) ..................................................................................................... 7

*Imbler v. Pachtman*,

   424 U.S. 409, 423 (1976) ..................................................................................................... 9

*Mitchell v. Forsyth*,

    472 U.S. 511, 521 (1985) ................................................................................... 7, 8

*Morse v. Frederick*,

    551 U.S. 393, 442–43 (2007) (Stevens, J., dissenting) .............................................. 3

*Nixon v. Fitzgerald*,

    457 U.S. 731, 744 (1982) ................................................................................ 7, 8, 9

*Noto v. United States*,

    367 U.S. 290, 297 (1961) ......................................................................................... 4

*Pierson v. Ray*,

    386 U.S. 547, 554 (1967) ......................................................................................... 8

*Tenney v. Brandhove*,

    341 U.S. 367, 377 (1951) ......................................................................................... 9

*Thomas v. Collins,*

    323 U.S. 516, 535 (1945) ......................................................................................... 3

## Other Authorities

147 Cong. Rec. H35 (daily ed. Jan. 6, 2001) (statements of Reps. Waters and Lee). 10

151 Cong. Rec. H110 (daily ed. Jan. 6, 2005) (statement by Rep. Lee) ...................... 10

151 Cong. Rec. H110–11 (daily ed. Jan. 6, 2005) (statements by Reps. Nadler and Lee) ........................................................................................................................... 10

163 Cong. Rec. H186–87, 189 (daily ed. Jan. 6, 2017) (statements of Reps. Jayapal, Lee, and Waters) ........................................................................................................ 10

3 J. Story, Commentaries on the Constitution of the United States § 1563, pp. 418-19 (1st ed. 1833) .................................................................................................................. 7

Daniel Lippman & Betsy Woodruff Swan, *Capitol Police whistleblower delivers scathing rebuke to 2 of its senior leaders Jan. 6*, POLITICO (Oct. 8, 2021), https://www.politico.com/news/2021/10/08/capitol-police-whistleblower-rebuke-jan-6-515696. .................................................................................................................. 5

DEP'T OF DEF., REVIEW OF THE DOD'S ROLE, RESPONSIBILITIES, AND ACTIONS TO PREPARE FOR AND RESPOND TO THE PROTEST AND ITS AFTERMATH AT THE U.S. CAPITOL CAMPUS ON JANUARY 6, 2021, DODIG-2022-039 ........................................ 5

Mark Hosenball & Sarah N. Lynch, *Exclusive: FBI finds scant evidence U.S. Capitol attack was coordinated*, REUTERS (Aug. 20, 2021), https://www.reuters.com/world/us/exclusive-fbi-finds-scant-evidence-us-capitol-attack-was-coordinated-sources-2021-08-20/ ............................................................. 5

STAFF OF S. COMM. ON HOMELAND SEC. & GOV'T AFFS., 117TH CONG. REP. ON EXAMINING THE U.S. CAPITOL ATTACK: A REVIEW OF THE SECURITY, PLANNING, AND RESPONSE FAILURES ON JANUARY 6 ("HSGA Report") .............................................. 5

**Regulations**

11 C.F.R. § 100.29 ................................................................................................................ 10

**U.S. Constitution**

U.S. Const. art. I, § 4 .............................................................................................................. 3

U.S. Const. art. II, § 3 ............................................................................................................. 8

The doctrine of absolute immunity dispositively resolves this case. When determining whether immunity covers a presidential act, the Supreme Court has been clear: the appropriate question is only whether the actions are within the "outer perimeter" of the President's duties. In making this analysis, the Court has determined only the nature of the presidential act is subject to review; content-based determinations of motives underlying that act are improper.

Here, the result is simple: the actions at issue, in this case, were within the outer perimeter of President Trump's office as it is a normal activity of a President to speak to the American people in support of, or opposition to, congressional action and arrange rallies to encourage petitioning of Congress. Courts are forbidden from inquiring into the motives behind such political speech and from setting regulations on the content of that speech. Consequently, the Constitution's absolute immunity doctrine protects President Trump from this lawsuit.

Plaintiff should be commended for her years of service and dedication to serving as a Capitol Police Officer. As President Trump has repeated many times, attacks against law enforcement officials are unacceptable. Plaintiff recognizes as much in her complaint, noting that President Trump tweeted on January 6: "[p]lease support our Capitol Police and Law Enforcement. They are truly on the side of our Country." Compl. at ¶ 109. Yet, in conflict with our nation's principles of absolute immunity, and President Trump's use of his First Amendment rights, Plaintiff seeks to hold President Trump accountable for the actions of others.

## BACKGROUND

President Trump is known for his patriotic and inspiring speeches that resonate with those who feel forgotten by Washington D.C.'s political establishment. Following the 2020 election, President Trump (among numerous others) raised critical questions about the results of elections in several states. In the weeks and months after the election, President Trump and his supporters engaged in litigation, recounts, and appeals. As described in detail in other briefs the President submitted before this Court, post-election challenges are common and made frequently by candidates of both political parties. *See, e.g., Blassingame, et al. v. Trump,* Case No. 1:21-cv-00858, ECF No. 10.1, Mem. in Support of Mot. to Dismiss, at *2–3 (D.D.C. June 24, 2021).

The public anticipates that Presidents will take advantage of the bully pulpit. As the nation's chief executive, Presidents routinely comment on election results and petition Congress to act (or refrain from acting). This is precisely what President Trump did.

After the 2020 election, President Trump called-out critical failures in securing our nation's election procedures. As part of his constitutional duty to ensure the laws be faithfully executed, President Trump tried to inspire Congress to postpone certifying election results until various lawsuits challenging those results concluded. Unlike Plaintiff's characterization, the rally at the Ellipse was not an attempt to inspire a violent riot to interfere with Congress. *See* Compl. at ¶¶ 39–40 (alleging President Trump's tweets about the rally were understood as "a literal call to arms"

and "marching orders"). Instead, the rally was a gathering of like-minded individuals who believed state executive branches had violated the Constitution by changing election procedures under assumed emergency powers when that power rightfully belongs only to state legislatures and who wanted Congress to understand the gravity of the violations and vote accordingly. *See* U.S. Const. art. I, § 4.

Plaintiff alleges President Trump's speech, which expressed his strongly held belief in the insecurity of an election conducted through last minute, hastily implemented mail-in voting procedures, was somehow intended to incite others. Compl. at ¶ 126. Yet the invitation to adjudicate the content of a political speech is one that should be flatly and firmly declined. Plaintiff alleges that others interpreted President Trump's speech as an invitation to violence. *See, e.g.,* Compl. at ¶ 39 (alleging the rally was "understood by many of [Trump's] supporters as a literal call to arms"); ¶ 40 (alleging users of TheDonald.win interpreted the rally announcement to be "marching orders"); ¶ 41 (alleging Oath Keeper "knew the Jan. 6 even would be no mere 'rally'"). The Supreme Court has reiterated that it is not the effect on or subsequent actions of the listeners that is relevant to a court's inquiry about protected speech. *See Brandenburg v. Ohio*, 395 U.S. 444, 449 (1969).

Additionally, such imputation of knowledge and liability is not in line with our nation's First Amendment jurisprudence, an inseparable part of the President's bully pulpit. Indeed, our legal standard has consistently required intent on the part of the speaker to incur liability. *See Morse v. Frederick,* 551 U.S. 393, 442–43 (2007)

3

(Stevens, J., dissenting) (quoting *Thomas v. Collins,* 323 U.S. 516, 535 (1945)); *Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 253 (2002).

Moreover, individuals need not disavow misinterpretations of their speech by others to shield themselves from liability. *See Brandenburg*, 395 U.S. at 447–48 (distinguishing third-party actions subsequent to speech for which a proponent can and cannot be held responsible); *Noto v. United States*, 367 U.S. 290, 297 (1961) (pointing to the "distinction between the statement of an idea which may prompt its hearer to take unlawful action, and advocacy that such action be taken.") (internal citations omitted); Compl. at ¶¶ 35, 106, 109. Accepting Plaintiff's theory of liability would drastically chill political speech because public officials and candidates for public office could be held legally accountable if their supporters misinterpret, or otherwise use, their passionate or fiery rhetoric and decide to carry out acts of violence or other illegal activity.

In support of her complaint, Plaintiff alleges (incorrectly) that President Trump encouraged violence by his supporters and imputes that he knew some of his supporters were advocating for actual violence at the Capitol. *See* Compl. at ¶ 13, 39–41. These allegations are incredible, considering that even the full resources of the intelligence community did not find the comments worthy of adding additional security to the Capitol—which President Trump offered to Mayor Bowser, and she

4

refused.[1] Indeed, "[t]he FBI has found scant evidence the Jan. 6 attack on the U.S. Capitol was the result of an organized plot to overturn the presidential election result."[2] Moreover, a letter to Speaker Pelosi from a whistleblower alleges that certain capitol police officials decided to not act to protect the Capitol in a self-serving attempt to advance their own careers.[3]

Additionally, a Senate committee report found that President Trump had delegated the ability to use emergency powers.[4] President Trump designated a lead federal agency to deal with the security concerns around the January 6 counting of electoral ballots. Further, President Trump personally asked if the security was ready on January 3.[5] These are not the actions of a co-conspirator attempting to stage a violent attack, but rather the actions of a leader concerned with ensuring security is

---

[1] DEP'T OF DEF., REVIEW OF THE DOD'S ROLE, RESPONSIBILITIES, AND ACTIONS TO PREPARE FOR AND RESPOND TO THE PROTEST AND ITS AFTERMATH AT THE U.S. CAPITOL CAMPUS ON JANUARY 6, 2021, DODIG-2022-039 at 120, 16 (quoting a January 5 letter from Mayor Bowser and noting that President Trump asked about law enforcement preparedness on January 3 and told Defense Secretary Miller to "do what's required to protect the American people").

[2] Mark Hosenball & Sarah N. Lynch, *Exclusive: FBI finds scant evidence U.S. Capitol attack was coordinated*, REUTERS (Aug. 20, 2021), https://www.reuters.com/world/us/exclusive-fbi-finds-scant-evidence-us-capitol-attack-was-coordinated-sources-2021-08-20/./.

[3] Daniel Lippman & Betsy Woodruff Swan, *Capitol Police whistleblower delivers scathing rebuke to 2 of its senior leaders Jan. 6*, POLITICO (Oct. 8, 2021), https://www.politico.com/news/2021/10/08/capitol-police-whistleblower-rebuke-jan-6-515696.

[4] *See* STAFF OF S. COMM. ON HOMELAND SEC. & GOV'T AFFS., 117TH CONG. REP. ON EXAMINING THE U.S. CAPITOL ATTACK: A REVIEW OF THE SECURITY, PLANNING, AND RESPONSE FAILURES ON JANUARY 6 ("HSGA Report").

[5] *Id.* at 77.

5

properly in place, and individuals tasked with protecting our nation's capital were adequately supported.

## THE ALLEGATIONS AGAINST PRESIDENT TRUMP

Plaintiff here alleges that President Trump "inflamed, encouraged, incited, directed, and aided and abetted" the people that entered the Capitol on January 6, 2021. *See Compl.* at ¶ 11. These allegations rely on out-of-context political speech and expression made by the President in press statements, social media, and the rally at the Ellipse. While it is expected for individuals to sue anyone whom they can allege is involved with a harm they suffered in the hopes of finding out who was responsible, here Plaintiff knows who caused her harm. Her alleged injuries are the result third-party conduct, perpetrated by individuals unaffiliated with President Trump.

The speech that Plaintiff alleges incited others was speech on matters of public concern, namely the security of the changes to election procedures and congressional action certifying the election. To ascribe liability for the unlawful conduct of others based on protected political speech would contradict the Supreme Court's well-established First Amendment precedent and curtail President Trump's immunity as President. While an adverse holding would burden all individuals, the presidency, in particular, should not be burdened with apprehension that liability may attach for political speech and action: the high-profile nature of the office and the need for quick decision making on critical issues support a conclusion to dismiss lawsuits of this nature.

ARGUMENT

I.     Absolute immunity bars the claims against President Trump.

Presidents must be decisive. When making critically important decisions, often of historic proportions, it is imperative that presidential decision-making not be chilled by a fear that official, discretionary actions will result in civil liability—ripening either during or after the presidential term. Consequently, courts have long held that absolute immunity, a doctrine grounded in the principle of separation of powers and entrenched in precedent dating back to common law traditions, protects Presidents. *See Mitchell v. Forsyth*, 472 U.S. 511, 521 (1985); *Nixon v. Fitzgerald*, 457 U.S. 731, 744 (1982); 3 J. Story, Commentaries on the Constitution of the United States § 1563, pp. 418-19 (1st ed. 1833) (reasoning that the President "must be deemed, in civil cases at least, to possess an official inviolability"). This immunity is based on considerations of the official function, the nature of the task in question, and the practical need to insulate the official's decision-making from second-guessing by the courts. *See Harlow v. Fitzgerald*, 457 U.S. 800, 807 (1982) (holding that absolute immunity extends to "legislators, in their legislative functions," "judges, in their judicial functions," members of the executive branch who perform prosecutorial or adjudicative functions, and the President); *Mitchell*, 472 U.S. at 521 (explaining that the Court looks to the "historical or common-law basis for the immunity in question").

Immunity covers the President's conduct up to the "outer perimeter" of his duties. *See Chastain v. Sundquist*, 833 F.2d 311, 315 (D.C. Cir. 1987) (holding that presidential immunity "is absolute, . . . subject only to the requirement that [his]

7

actions fall within the outer perimeter of [his] official duties"); *Clinton v. Jones*, 520 U.S. 681, 696 (1997) (finding no immunity for purely private acts or acts outside of official duties). Indeed, decisions, where a President has been found subject to suit for an action taken during his presidency, are non-existent in the various circuit courts of appeal. Claims attempting to hold the President civilly liable for a speech, rally, or petitioning activity would irreparably distort his decision-making process in a way that the Court recognizes is unacceptable.

Immunity is the right not just to avoid judgment but also to avoid pretrial burdens, which can be disruptive to effective governance. *See Mitchell*, 472 U.S. at 526; *Behrens v. Pelletier*, 516 U.S. 299, 308 (1996). Precluding civil litigation against the President is vital to ensuring a functioning executive branch—the absence of immunity would incentivize lawsuits that would make the President hesitant to exercise his discretion "even when the public interest required bold and unhesitating action." *Nixon*, 457 U.S. at 744–45. *See also Pierson v. Ray*, 386 U.S. 547, 554 (1967) (explaining that immunity serves the public interest in preserving the independence and decisiveness necessary of government officials). Even when a plaintiff alleges that a president's actions exceed his legal authority, the privilege *still* prohibits litigation. Otherwise, the rule would be swallowed whole by the exception; litigation would constantly test whether a particular "action was unlawful[] or was taken for a forbidden purpose." *Nixon*, 457 U.S. at 756.

      a.      **The nature of President Trump's speech and practical need to insulate the President from improper influence upon his decision-making support a finding of presidential immunity.**

Here, President Trump was engaged in discretionary action pursuant to his Constitutional duty to ensure that the "Laws be faithfully executed," U.S. Const. art. II, § 3, by petitioning Congress not to certify the electors from States with ongoing election challenges and speaking publicly about congressional action. As such, he is entitled to absolute immunity because his speech did not violate any clearly established legal duties. The Court has continuously reaffirmed the purpose of immunities to allow officials to carry out their functions without fear of civil retribution for legitimate acts. *See Nixon,* 457 U.S. at 749; *Tenney v. Brandhove*, 341 U.S. 367, 377 (1951); *Imbler v. Pachtman,* 424 U.S. 409, 423 (1976).

President Trump was engaged in the execution of his duties as President. Duties that are solely determined by the person properly elected to that office. In this case, those duties involved the use of his bully pulpit to ensure the faithful execution of the laws of the United States and lobbying for proper legislative action to the same ends. The office of President requires the ability to act boldly and fearlessly to carry out the duties of the office.

A holding that Plaintiff can bring a suit of this subjective nature would encourage political opponents to take their disputes out of the public square and the halls of Congress and into courtrooms to punish a president for his disfavored speech. The President's absolute immunity forecloses the jurisdiction of this Court.

### b. The speech on which Plaintiff's allegations rely was made in President Trump's official capacity.

The speech that President Trump gave on January 6, 2021, regarding the 2020 Presidential Election is certainly on matters of public concern. As President, it is his duty to ensure that the laws are faithfully executed, and he had valid concerns about the results of the November election. Allegations of election interference were more than welcome by politicians and the media in 2000, 2004, and 2016 when Democratic policymakers were voicing them.[6] Yet in 2020, President Trump was decried for voicing concerns with the massive changes to state election procedures that brought uncertainty into the security of the election procedures. Given that partisan State Legislatures control the process of elections, the President had every right to question whether procedures were being followed and were secure.

Plaintiff alleges that President Trump's speech after the election day and leading up to the rally at the Ellipse was made in his personal capacity as a candidate for elected office. *See* Compl. at ¶¶ 23, 51. Yet the definition of electioneering requires that individuals be advocating for a particular election result or candidate. *See, e.g.,* 11 C.F.R. § 100.29 (defining the Federal Elections Commission's four requirements

---

[6] *See* 147 Cong. Rec. H35 (daily ed. Jan. 6, 2001) (statements of Reps. Waters and Lee); 151 Cong. Rec. H110 (daily ed. Jan. 6, 2005) (statement by Rep. Lee); 151 Cong. Rec. H110–11 (daily ed. Jan. 6, 2005) (statements by Reps. Nadler and Lee); 163 Cong. Rec. H186–87, 189 (daily ed. Jan. 6, 2017) (statements of Reps. Jayapal, Lee, and Waters).

for a communication to be considered electioneering). Commenting on the integrity of the elections does not make that commentary campaign speech. And as the Fourth Circuit held, after the end of the election, "President Trump was no longer a candidate for public office," and he was not engaged in electioneering. *Am. Fed'n of Gov't Emps. v. Off. of Special Couns.*, 1 F.4th 180, 187–88 (4th Cir. 2021).

Questioning the propriety of the election was part of the President's duty to uphold and defend the Constitution. At the very least, his discussion of the matter while attempting to petition the government to redress his grievance was a matter of public concern cloaked with the highest presumption of protection. It does not meet the standards described by the Supreme Court for when speech may be restricted without violating the First Amendment.

## CONCLUSION

For the foregoing reasons, President Trump respectfully requests this Court dismiss Plaintiff's Complaint in its entirety with prejudice.

Dated: March 21, 2022                             Respectfully submitted,

                                                                                         */s/ Jesse R. Binnall*
Jesse R. Binnall (VA022)
BINNALL LAW GROUP, PLLC
717 King Street, Suite 200
Alexandria, Virginia 22314
Phone: (703) 888-1943
Fax: (703) 888-1930
Email: jesse@binnall.com

Attorney for *Donald J. Trump*

## CERTIFICATE OF SERVICE

I certify that on March 21, 2022, a copy of the foregoing was filed with the Clerk of the Court using the Court's CM/ECF system, which will send a copy to all counsel of record.

/s/ Jesse R. Binnall
Jesse R. Binnall

*Attorney for Donald J. Trump*
